566 A.2d 135

George William NICHOLSON, Jr.

v.

YAMAHA MOTOR COMPANY, LIMITED, et al.

No. 362, Sept. Term, 1989.

Court of Special Appeals of Maryland.

Dec. 1, 1989.

Edward T. Pinder (William J. Blondell, Jr., on the brief), Baltimore, for appellant.

Steven M. Levine and Walter J. Smith, Jr. (Wilson, Elser, Moskowitz, Edelman & Dicker, on the brief), Washington, D.C., for appellees.

Argued before WILNER, ALPERT and CATHELL, JJ.

WILNER, Judge.

Appellant, who now undoubtedly wishes that he hadn't, purchased a 1982 Yamaha motorcycle, Model XJ 400J. The motorcycle was manufactured by Yamaha Motor Company Ltd. of Japan, a Japanese corporation (Yamaha Japan). It entered the American stream of commerce through Yamaha Japan's American distributor, Yamaha Motor Corporation, U.S.A. (Yamaha America), which, in turn, distributed it to a regional distributor, Maryland Yamaha, Inc. (Yamaha Maryland). Yamaha Maryland ultimately sold the vehicle to appellant.

On November 21, 1984, while driving his motorcycle in Baltimore City, appellant was struck by an automobile that made a left turn into his path. As a result of the collision, appellant suffered injury to his left leg. Believing that his injuries were due, at least in part, to the absence of a crash bar or other protective device on the motorcycle, he sued all three Yamaha corporations in the Circuit Court for Baltimore City.

Appellant attempted service on Yamaha Japan by sending a copy of the complaint and writ of summons to its president in Japan by registered mail, return receipt requested. A receipt, signed by one Tomoko Kato, was eventually returned. Nonetheless, Yamaha Japan successfully moved to quash the service as not being in accord with the requirements for service on a Japanese defendant set forth in a 1965 treaty to which the United States and Japan are parties.[1] The other two defendants moved to dismiss the

---

1. The official name of the treaty is the *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commer-*

complaint on more substantive grounds, basically that it failed to state a cause of action. Those motions were granted, with leave to amend.

Appellant thereupon filed an amended complaint alleging five causes of action against the three defendants—"gross negligence" in the design of the motorcycle and in the defendants' failure to warn of the defect in design (Count One), breach of implied warranties of safety, fitness, and merchantability (Count Two), strict liability for design defect (Count Three), strict liability for failure to warn (Count Four), and misrepresentation (Count Five). He made no attempt to serve the amended complaint directly on Yamaha Japan but instead served that defendant's copy on the attorneys who had entered their appearance on behalf of Yamaha America and who had filed the earlier motion to quash on behalf of Yamaha Japan. Eventually, the court disposed of the case by (1) granting Yamaha Japan's motion to dismiss for lack of effective service and (2) granting motions to dismiss, which it treated as motions for summary judgment, filed by the other two defendants based on failure to state a cause of action.

In this appeal, appellant complains about the dismissal of Yamaha Japan and the judgment entered for the other defendants with respect to four of the five counts in the amended complaint. He makes no argument with respect to the judgment as to Count Five (Misrepresentation).

## SERVICE ON YAMAHA JAPAN

When he filed his initial complaint, appellant treated all three defendants as completely separate entities and attempted service on each individually. Service on Yamaha America was obtained by serving process on its president,

---

*cial Matters.* It was adopted November 15, 1965, but did not become operative until February, 1969. The text is found in 20 U.S.T. 361, T.I.A.S. No. 6638; it is reprinted in 28 U.S.C.A., Fed.R.Civ.P. 4, at 130–44 (West Supp.1989). We shall refer to it hereafter as the Hague Convention.

Takeshi Kimura, in Cypress, California; service on Yamaha Maryland was effected by serving process on one Joseph H. Rouse in Glen Burnie, Maryland. Yamaha Japan was alleged to be "a foreign corporation doing business in the State of Maryland"; service on it was attempted by sending a copy of the complaint, prayer for jury trial, and summons, all in English, to its president, Hideto Eguchi, in Iwata City, Japan, by certified mail.

As we observed, the material sent to Mr. Eguchi was apparently received by someone else, Tomoko Kato. The record does not reveal Mr. Kato's connection with Yamaha Japan. Although never denying the actual receipt of the papers sent by appellant, Yamaha Japan responded with a motion to quash the service as not being in accord with the Hague Convention. In November, 1986, the court granted that motion. Appellant made no further effort to serve Yamaha Japan directly. He attempted to serve the amended complaint, which was filed about a month before the court's ruling on the motion to quash, on Yamaha Japan by serving a copy on counsel for Yamaha America. That too the court found wanting.

In this appeal, appellant urges that service was properly effected on Yamaha Japan (1) by sending the process to its president by restricted delivery mail pursuant to Rule 2–121(a) and (2) by serving the amended complaint on its "domestic agent," Yamaha America. We have considerable difficulty with the second of these propositions under the facts of this case, but we need not reach that issue because we find merit in the first argument.

The Hague Convention, which revised parts of two earlier treaties on the subject, "was intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 108 S.Ct. 2104, 2107, 100 L.Ed.2d 722 (1988). The Convention applies, and its procedures must be gratified, "in all cases, in civil and commercial matters, where there is

occasion to transmit a judicial or extrajudicial document for service abroad." Art. 1; 20 U.S.T. 361, 362.

The mechanism devised by the Convention for achieving its several purposes is the creation or designation by each adherent of a Central Authority to receive requests for service of documents from other countries and to serve those documents in accordance, or in a manner consistent, with the internal law of the recipient nation. Art. 5 of the Convention, being part of the Chapter on "Judicial Documents," states, in relevant part, that:

"The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either—

(a) by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

(b) by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed."

Art. 3 of the Convention requires the "authority or judicial officer" competent under the law of the requesting State to forward to the Central Authority of the recipient State "a request conforming to the model annexed to the present Convention" accompanied by "[t]he document to be served or a copy thereof...." Upon service of the document, the Central Authority prepares and sends to the applicant a certificate attesting to the service and stating the date, place, and method of service and the person served. *Id.* at art. 6.

Japan designated its Minister of Foreign Affairs as its Central Authority under the Convention. Appellant concedes that he never sent either a request or the relevant documents to the Minister for service on Yamaha Japan. The method of service particularly selected by the Convention, therefore, was not used.

Service through a Central Authority is not necessarily an exclusive method of serving defendants resident in party-

nations. The Convention itself allows for alternative methods under certain circumstances, and in *Volkswagenwerk Aktiengesellschaft v. Schlunk, supra,* 108 S.Ct. 2104, the Supreme Court concluded that the Convention did not apply when process is served on a foreign corporation through service on a domestic subsidiary deemed under State law to be the foreign corporation's involuntary agent for service.

Of the several alternative methods provided for in the Convention itself, appellant relies on two—art. 10 and art. 19.[2]

Art. 10 states:

"Provided the State of destination does not object, the present convention shall not interfere with—

(a) the freedom to *send* judicial documents, by postal channels, directly to persons abroad,

(b) the freedom of judicial officers, officials or other competent persons of the State of origin *to effect service* of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination[,]

(c) the freedom of any person interested in a judicial proceeding *to effect service* of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."

(Emphasis added.)

Japan did indeed object to paragraphs (b) and (c), and so only paragraph (a) of art. 10 applies with respect to Japanese defendants.

Art. 19 provides: "To the extent that the internal law of a contracting State permits methods of transmission, other than those provided for in the preceding articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions."

---

**2.** In addition to the methods allowed under articles 10 and 19, art. 8 permits service through the diplomatic or consular agents of the sending State. No effort was made by appellant to use that approach.

Appellant argues that service of process by mail is allowed under Maryland law by Md. Rule 2–121 and under Japanese law by articles 162, 169, 170, 171, and 172 of the Japanese Code of Civil Procedure. Accordingly, he contends, service by certified mail directed to the president of Yamaha Japan does not offend the Convention and indeed is permissible under articles 10(a) and 19.

There are two different questions here: first, whether the authority in art. 10(a) "to *send* judicial documents, by postal channels, directly to persons abroad" (emphasis added) includes the authority to *serve process* by those channels; and, second, whether internal Japanese law permits service of process in that manner. We shall deal with the second of these questions first, as it affects, to some extent, our analysis of the first question.

The sections of the Japanese Code of Civil Procedure cited by appellant are part of Book I, Ch. IV, § 3, dealing with Service. Section 3 consists of articles 160–81.

Article 161 states the general principle that "[t]he business relating to service shall be administered by a court clerk." Article 162 permits service to be effected "by a bailiff or by mail" but provides that "[i]n regard to service by mail, a postman shall be an official effecting service." Succeeding articles in § 3 deal with the manner of effecting service, where service may be made, and upon whom it may be made. There is no doubt that service may be effected by mail. Article 162 makes that clear as do articles 170 and 172. It also seems clear, however, when these succeeding articles are read in conjunction with articles 161 and 162, that, whatever method is used, it is the *clerk* or his agent that must make the service. Robert W. Peterson makes that point succinctly in *Jurisdiction and the Japanese Defendant*, 25 Santa Clara L. Rev. 555, 577 (1985):

"Civil law countries generally view service of process as a purely sovereign act; *consequently, they require service to be made through government officials or official channels.* Japan, whose legal system is modeled after the German Civil Code, is no exception. The Japanese

Civil Procedure Code provides 'All matters concerning service shall be handled by court clerks.' *Unlike the American practice, neither Japanese attorneys nor private citizens may serve process either in Japan or abroad.* When process is served by mail in Japan, the court clerk uses a special form of mail. The court clerk stamps the outside of the envelope with a notice of special service ('tokubetsu sootatsu'). The mail-carrier acts as a special officer of the court by recording the proof of delivery on a special proof of service form and returning it to the court clerk."

(Footnotes omitted; emphasis added.) *See also* Y. Fujita, *Service of American Process Upon Japanese Nationals by Registered Airmail and Enforceability of Resulting American Judgments in Japan,* 12 Law in Japan 69 (Z. Kitagawa ed. 1985). At 73, Mr. Fujita states:

"Service of process (*sotatsu*) is clearly distinguished from a mere notification (*tsuchi*), requiring no officiality or formality. The official formality is required to warn the addressee that an authoritative, public action has been taken against him, as well as to prevent future disputes as to whether a sufficient notice has been given.

In an ordinary domestic case, indeed, delivery of a Japanese summons and complaint is usually done by a mailman rather than a bailiff or clerk, the mailman acting by law as an officer of the court. In that sense, one might say that service by mail is not inconsistent with Japanese internal law. However, 'any form of mail' is not sufficient. The special form, bearing the stamp '*tokubetsu sotatsu*' (special service) as described by law, is required. This special form of mail is not accessible to anyone but a court clerk, and the proof of service is documented by the mailman in a special form and submitted to the court in accordance with the law. *Therefore, service of process by mail in Japan cannot be attempted or effected by any private person; service by*

> *mail avoids inconsistency with Japanese internal law*
> *only when resorted to by a court clerk."*

(Footnotes omitted; emphasis added.)

The formality of this process in Japan—the commitment of it to the court clerk—raises the question of whether, in acceding to art. 10(a) of the Hague Convention, Japan intended to permit foreign citizens to do what its own citizens could not do—serve Japanese defendants in Japan directly by mail. American courts are very much divided on that issue.

The courts and commentators taking the negative of the issue and holding that art. 10(a) does *not* permit direct mail service of a Japanese citizen in Japan stress the incongruity of the contrary approach. They also look at the particular language of art. 10(a), which speaks of the freedom "to send" judicial documents by postal channels, and contrast it with art. 10(b) and (c), which were rejected by Japan, allowing foreign plaintiffs "to effect service" of judicial documents through Japanese judicial officers or other officials. This difference in language, they conclude, suggests that art. 10(a) does not encompass documents that require formal service. A good, and representative, exposition of this view is found in *Suzuki Motor Co. v. Superior Court*, 200 Cal.App.3d 1476, 1481, 249 Cal.Rptr. 376 (1988):

> "Given the fact that Japan itself does not recognize a form of service sufficiently equivalent to America's registered mail system, it is extremely unlikely that Japan's failure to object to Article 10, subdivision (a) was intended to authorize the use of registered mail as an effective mode of service of process, particularly in light of the fact that Japan specifically objected to the much more formal modes of service by *Japanese officials* which were available in Article 10, subdivisions (b) and (c). Instead, it seems much more likely that Japan interpreted Article 10, subdivision (a) as allowing only the *transmission* of judicial documents, rather than the *service of process*. This interpretation is all the more reasonable given the fact that the Convention persistently refers to

'service' as opposed to 'send,' e.g., 'forward documents, *for the purpose of service'* (Article 9, [emphasis] added); 'transmission of judicial documents *for service'* (Article 14 [emphasis] added); and 'transmitted abroad for the *purpose of service'* (Arts. 15 and 16, [emphasis] added), in contrast to 'the freedom to *send* judicial documents, by postal channels, directly to persons abroad, . . .' (Art. 10, subd. (a), [emphasis] added). (1) It is a well-recognized canon of statutory interpretation that words in a statute or similar enactment are to be given their common and ordinary meaning . . ., and that *every* word and phrase used is presumed to have a meaning and to perform a useful function. . . . (2) To interpret the phrase 'to send' as used in Article 10, subdivision (a) of the Convention to mean 'to serve' would fly in the face of both these rules; the common and ordinary meaning of 'to send' is 'to cause to be conveyed by an intermediary to a destination' or 'to dispatch, as by mail or telegraph' (see 'send,' The American Heritage Dict. of the English Language (1969) p. 1179) *not* 'to serve,' and the fact the Convention's drafters used both the phrase 'to send' and the phrase 'service of process' indicates they intended each phrase to have a different meaning and function."

(Citations omitted.) For other cases and articles adopting this view, see *Mommsen v. Toro Co.,* 108 F.R.D. 444 (S.D.Iowa 1985); *Pochop v. Toyota Motor Co., Ltd.,* 111 F.R.D. 464 (S.D.Miss.1986); *Cooper v. Makita, U.S.A., Inc.,* 117 F.R.D. 16 (D.Me.1987); *Bankston v. Toyota Motor Corp.,* 123 F.R.D. 595 (W.D.Ark.1989); *Hantover, Inc. v. Omet, S.N.C. of Volentieri & C.,* 688 F.Supp. 1377 (W.D. Mo.1988); *Ordmandy v. Lynn,* 122 Misc.2d 954, 472 N.Y. S.2d 274 (1984); *Reynolds v. Koh,* 109 A.D.2d 97, 490 N.Y.S.2d 295 (App.Div.1985); see also R. Peterson, *supra,* 25 Santa Clara L.Rev. at 577–78; Y. Fujita, *supra,* 12 Law in Japan at 73, 80; E. Routh, *Litigation Between Japanese and American Parties,* A.B.A., *Current Legal Aspects of Doing Business in Japan and East Asia* 188, 190 (J. Haley ed. 1978).

The contrary view was first expressed by another California court. In *Shoei Kako Co. v. Superior Court,* 33 Cal.App.3d 808, 821, 109 Cal.Rptr. 402 (1973), the Court noted the difference in language between art. 10(a) and the other articles of the Convention and considered the argument that the freedom "to send" documents provided for in art. 10(a) did not encompass documents required to be "served." It concluded, however, at 821 that:

> "Although there is some merit to the proposed distinction it is outweighed by consideration of the entire scope of the convention. It purports to deal with the subject of service abroad of judicial documents. The reference to 'the freedom to send judicial documents by postal channels, directly to persons abroad' would be superfluous unless it was related to the sending of such documents for the purpose of service. The mails are open to all. Moreover, the reference appears in the context of other alternatives to the use of the 'Central Authority' created by the treaty. If it be assumed that the purpose of the convention is to establish one method to avoid the difficulties and controversy attendant to the use of other methods ..., it does not necessarily follow that other methods may not be used if effective proof of delivery can be made."

(Citations omitted.)

The Court observed that ratification of the Hague Convention by the United States Senate came only four years after promulgation of Rule 4(i)(1)(D) of the Federal Rules of Civil Procedure, allowing service in a foreign country by any form of mail requiring a signed receipt, addressed to the person to be served. It suggested, then, that, in approving art. 10(a), the Senate would not have intended to abrogate "what it had impliedly approved four years earlier" but found it "more reasonable to infer that in approving subdivision (a) of article 10 the Senate intended to retain service by mail, as provided in subdivision (i) of rule 4, as an effective method of service of process in a foreign country

unless that country objected to those provisions." *Id.* at 821–22, 109 Cal.Rptr. 402.

Finally, the Court noted:

"[I]t does not appear that service by mail with evidence of delivery is not 'a method prescribed by the internal law of [Japan] for the service of documents in domestic actions upon persons who are within its territory....' (Art. 15, subd. (a).) From all that appears in the record the internal law of Japan permits transmission by postal channels of documents coming from abroad for service within its territory. The failure to object to the provisions of subdivision (a) of article 10 may be so construed."

*Shoei, supra,* 33 Cal.App.3d at 822, 109 Cal.Rptr. 402 (footnote omitted). For other cases and articles supporting that view and holding that service by registered mail is acceptable under art. 10(a), see *Ackermann v. Levine,* 788 F.2d 830, 839 (2d Cir.1986); *Zisman v. Sieger,* 106 F.R.D. 194, 199 (N.D.Ill.1985); *Chrysler Corp. v. General Motors Corp.,* 589 F.Supp. 1182, 1206 (D.C.1984); *Weight v. Kawasaki Heavy Industries, Ltd.,* 597 F.Supp. 1082, 1085–86 (E.D.Va.1984); *Lemme v. Wine of Japan Import, Inc.,* 631 F.Supp. 456, 463–64 (E.D.N.Y.1986); *Newport Components v. NEC Home Electronics,* 671 F.Supp. 1525, 1541–42 (C.D. Cal.1987); *Smith v. Dainichi Kinzoku Kogyo Co., Ltd.,* 680 F.Supp. 847, 850 (W.D.Tex.1988); *Sandoval v. Honda Motor Co., Ltd.,* 364 Pa.Super. 136, 527 A.2d 564, 566 (1987). *See also Practical Handbook on the Operation of the Hague Convention of 15 November on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Practical Handbook)* 112 (1983); 1 B. Ristau, *International Judicial Assistance (Civil and Commercial)* § 4–28 at 165–67 (1984); *Service of Process Abroad: A Nuts and Bolts Guide,* Committee on Federal Courts of the New York State Bar Association, 122 F.R.D. 63, 79–81 (1988). The *Ackermann* Court, indeed, citing Ristau's work, concluded, 788 F.2d at 839:

"[T]he word 'send' in Article 10(a) was intended to mean 'service.' *See* Ristau, *supra,* § 4–28 at 165–67 (reviewing

the *Rapporteur's* report on the final text of the Convention and reaching the 'inescapable' conclusion that use of 'send' rather than the otherwise consistently used 'service' 'must be attributed to careless drafting).' "

The official Japanese position on this issue of whether direct service by mail is allowed is, as best we can gauge it, ambiguous.

The Hague Convention was, apparently, largely the product of the Hague Conference on Private International Law, which continues to monitor the operation of the Convention. At a special meeting of the members of the Convention in April, 1989, called to discuss some of the problems arising under the Convention, the issue of service by post under art. 10(a) arose. The minutes of that meeting reveal the following:

> "*QUESTION D*—On the invitation of *the Chairman,* the *Secretary General* reminded delegates that postal means of service is a method quite separate from service via the Central Authorities or between judicial officers.
>
> The best evidence of this, in his view, was that this type of service could be the subject of a reservation by Contracting States who considered that service by post was an infringement of their sovereignty.
>
> Therefore, in the opinion of the Permanent Bureau, theoretical doubts about the legal nature of the procedure were unjustified.
>
> The Japanese delegation explained that their Government wished the following statement of position to be made known:
>
>> '*Japanese position on Article 10(a) of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*
>>
>> *Japan has not declared that it objects to the sending of judicial documents, by postal channels, directly to persons abroad. In this connection, Japan (in the statement by its representative to the Special Com-*

*mission of April 1989 on the operation of the Conventions on the Service of Documents Abroad and on the Taking of Evidence Abroad) has made it clear that no objection to the use of postal channels for sending judicial documents to persons in Japan does not necessarily imply that the sending by such a method is considered valid service in Japan; it merely indicates that Japan does not consider it as infringement of its sovereign power.'*

The Permanent Bureau made note of this declaration and expressed the intention to include the Japanese position in the Practical Handbook." [3]

The question of whether service can be validly effected on a Japanese defendant by restricted delivery mail may well have to be decided in two different fora. If a judgment based on such service is sought to be enforced against the defendant's assets located in the United States, the Supreme Court would seem to be the ultimate arbiter, having to choose between the two competing views. No views have yet been expressed by the Supreme Court. If the judgment is sought to be enforced in Japan, however, the Japanese courts may well have the last word, especially in light of the above Declaration.

We are not privy to whatever evidence led the Second Circuit Court of Appeals in *Ackermann v. Levine, supra,* 788 F.2d 830, to conclude that the word "send," as used in art. 10(a), was intended to mean "serve." The record before us is bare in that regard, and we are therefore not willing to attribute the use of that word to sloppy draftsmanship. We also recognize the incongruity of ascribing to the Japanese an intent to give foreigners a privilege not given to their own citizens. But the compelling facts are that (1) when adopting the Convention, the Japanese were

---

**3.** The "Practical Handbook," known formally as the *Practical Handbook on the Operation of the Hague Convention of 15 November on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters,* is a publication of the Permanent Bureau of the Hague Conference on Private International Law.

presumably aware of U.S.Fed.R.Civ.P. 4(i), if not the counterpart State Rules such as current Md. Rule 2–121(a), allowing service abroad by restricted delivery mail, (2) since then, they have been made aware of the decisions in many Federal cases that art. 10(a) does *not* prohibit service in Japan by that method, (3) under that line of decisions, U.S. based assets of Japanese nationals would be subject to seizure to satisfy judgments founded upon such service, and (4) in their only Declaration on the matter, they did not expressly negate the validity of such service, reserving only whether their own courts might find it wanting. When given an opportunity, Japan did not regard service by mail as an infringement upon its sovereignty, as Messrs. Peterson and Fujita suggest would be the case.

Principally on that basis—because otherwise there are compelling arguments on both sides of the issue—we conclude that service may be effected on a Japanese defendant pursuant to Md. Rule 2–121(a). As there is no indication, apart from the art. 10(a) question, that service was not properly effected on Yamaha Japan pursuant to that Rule, we conclude that the court erred in granting the motion to quash and entering judgment based on lack of *in personam* jurisdiction. It is therefore unnecessary for us to consider the alternative arguments that service by mail is allowed under art. 19 of the Convention or that service was effected on Yamaha Japan through service on counsel to Yamaha America.

For reasons shortly to be explained, appellant's victory on this issue will prove to be a hollow one, at least in this case.

## SUBSTANCE OF AMENDED COMPLAINT
### General Allegations

In a Statement of Facts preliminary to all five counts, appellant alleged, in addition to his purchase of the motorcycle and the circumstances of the accident, that the defendants knew or should have known that side impacts are "the most frequent collision situation occurring between a

motorcycle and an automobile," that some 90% of all serious non-fatal injuries in motorcycle collisions involve "the lower aspects of the operator's body," and that the defendants failed to inform appellant "of the high degree of lower leg injuries." He claimed as well that the defendants knew or should have known that "structural modifications to the frame of a motorcycle" can be incorporated into the design of the vehicle "to prevent or lessen the severity of foreseeable lower extremity injuries to the operator," that they failed to inform appellant of the availability of such equipment or to manufacture or sell motorcycles with those "necessary design safety features." Finally, he contended that he was unaware of the foreseeability of the high degree of leg injuries or of the availability of equipment to prevent or lessen those kinds of injuries and that he "relied upon the Defendants' representations that the motorcycle was safe for its intended use."

From these averments, as well as those contained in the ensuing five counts, it is evident that the thrust of the complaint is that the motorcycle was not sufficiently "crashworthy." There is no allegation that the vehicle "malfunctioned" in any way—that it did not operate as it was designed to operate. Appellant's injuries arose from his collision with an automobile rather than from the motorcycle itself. His charge against the Yamaha defendants is that, such collisions being reasonably foreseeable, they failed to design the motorcycle to protect against specific kinds of injuries—those to the lower extremities—that often result from such collisions.

### Gross Negligence

Supplementing these general allegations, appellant alleged in Count One that the defendants knew or should have known that the motorcycle sold to him was "unsafe and dangerous" without modifications designed to protect the lower extremities of the rider, that it was foreseeable to the defendants that the motorcycle may be involved in collisions resulting in injuries to the operator's lower ex-

tremities, and that his injuries were the proximate result of their negligence.

That negligence, appellant asserted, consisted essentially of failing to warn him of the dangerous and unsafe characteristics of the motorcycle and of the specific risk to lower extremities, of failing to incorporate protective devices into the design of the motorcycle and to inform him that such devices were available, and of failing to test and discover safety features other than those currently available.

The question of whether the manufacturer (or distributor) of a vehicle could be held liable in negligence for injuries suffered by the operator or passenger of the vehicle in a collision with another vehicle, based on a failure to design the vehicle to protect against such injuries, was considered and resolved by the Court of Appeals in *Volkswagen of America v. Young,* 272 Md. 201, 321 A.2d 737 (1974). Adopting the principles set forth in *Larsen v. General Motors Corporation,* 391 F.2d 495 (8th Cir.1968), the Court answered in the affirmative, holding, at 216, that:

> "In sum, 'traditional rules of negligence' lead to the conclusion that an automobile manufacturer is liable for a defect in design which the manufacturer could have reasonably foreseen would cause or enhance injuries on impact, which is not patent or obvious to the user, and which in fact leads to or enhances the injuries in an automobile collision."

This very statement of liability contains one clear caveat that the Court saw fit to repeat later in its Opinion: that "there can be no recovery if the danger inherent in the particular design was obvious or patent to the user of the vehicle." *Id.* 272 Md. at 219, 321 A.2d 737. *See also Banks v. Iron Hustler Corp.,* 59 Md.App. 408, 475 A.2d 1243 (1984). In further discussion, the *Volkswagen of America* Court added another caveat, that, in determining the reasonableness of the care used by the manufacturer in designing the vehicle, there must be " 'a balancing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to

avoid the harm.' " *Volkswagen, supra,* 272 Md. at 219, 321
A.2d 737 (quoting *Larsen, supra*). In particular:

> "The style and type of vehicle, and its particular purpose,
> must be taken into consideration. A 'convertible could
> not be made "as safe in roll-over accidents as a standard
> four-door sedan with center posts and full-door frames." '
> ... Price must be a pertinent factor, as the cost of a
> particular design change may in some instances be so
> great, while adding little to safety, that the vehicle will be
> taken 'out of the price range of the market to which it
> was intended to appeal.' ... The nature of the accident is
> to be taken into account, as 'it could not reasonably be
> argued that a car manufacturer should be held liable
> because its vehicle collapsed when involved in a head-on
> collision with a large truck, at high speed.' ... There are
> perhaps many other factors that will be pertinent in
> particular cases. In order to impose liability, the trier of
> the facts must be able to conclude that the design was
> unreasonable in light of all of the relevant considera-
> tions."

*Id.* (citations omitted).

■ The defendants do not argue in this appeal that the
"crashworthiness" doctrine is inapplicable to motorcycles—
that it is restricted to automobiles. That argument has
been made in other cases, however, and, because it is a
threshold issue, it needs to be addressed. Most of the
courts that have considered it have rejected the argument.
*See Camacho v. Honda Motor Co., Ltd.,* 741 P.2d 1240
(Colo.1987), *cert. dismissed* 485 U.S. 901, 108 S.Ct. 1067, 99
L.Ed.2d 229 (1988), and cases cited therein. As the *Cama-
cho* Court held, at 1243–44:

> "We find no principled basis to conclude that liability for
> failure to provide reasonable, cost-acceptable safety fea-
> tures to reduce the severity of injuries suffered in inev-
> itable accidents should be imposed upon automobile man-
> ufacturers but not upon motorcycle manufacturers. The
> use of motorcycles for transportation over roadways is
> just as foreseeable as the use of automobiles for such

purpose. The crashworthiness doctrine does not require a manufacturer to provide absolute safety, but merely to provide some measure of reasonable, cost-effective safety in the foreseeable use of the product.... In view of the important goal of encouraging maximum development of reasonable, cost-efficient safety features in the manufacture of all products, the argument that motorcycle manufacturers should be exempt from liability under the crashworthiness doctrine because serious injury to users of that product is foreseeable must be rejected."

(Citations omitted.)

We agree with the approach and the rationale of the *Camacho* Court on this point. We see no reason why motorcycle manufacturers should be broadly exempt from the requirement to use reasonable care in the design of their products to avoid subjecting a user to an unreasonable risk of injury in a collision.

Application of the crashworthiness doctrine to motorcycles does not, of course, necessarily establish liability in this or any other case. It merely requires that we examine and apply the principles set forth in *Volkswagen of America*.

■ In this regard, this case reaches us in a somewhat peculiar posture. Although the Circuit Court treated the motions filed by Yamaha America and Yamaha Maryland as motions for summary judgment, presumably under Md. Rule 2–322(c), it does not appear from the record that any factual assertions extraneous to the pleadings themselves were before the court.[4] Appellant alleged in his amended complaint that he was unaware of the foreseeability of the high degree of lower leg injuries or of the availability of equipment to prevent or lessen those injuries but that the prospect of such injuries was "reasonably foreseeable" to the defendants.

---

4. The extraneous documents considered by the court appear to have been in connection with the issue of service on Yamaha Japan.

We are dealing here with what has become known as the "latent/patent rule," that there is no liability on the part of a manufacturer for negligence, either in design or in failure to warn, where the defect in question is open and obvious to the consumer. Whatever may be the logical merit of that rule, it still abounds in Maryland. *See Banks v. Iron Hustler Corp., supra,* 59 Md.App. 408, 475 A.2d 1243 (1984); *C & K Lord v. Carter,* 74 Md.App. 68, 536 A.2d 699 (1988).

The latent/patent rule has an *objective,* not a *subjective,* basis. The question is not whether the particular plaintiff actually foresaw the potential danger but whether the danger was sufficiently evident that a reasonable buyer in the plaintiff's position would have foreseen it. One cannot impose liability where it would not otherwise exist simply by denying knowledge of that which to any reasonable person would be obvious.

Often, as in *Banks* and *C & K Lord,* the patency of the danger is a jury issue because reasonable minds could differ on it. That is not the case here, however. One need do no more than look at a motorcycle unequipped with special devices to know that it provides no protection to lower limbs straddling the vehicle in the event of a collision from either side. Appellant's self-serving and virtually unrefutable assertion that *he* was unaware of the danger does not suffice to make the question a jury issue. As the "latent/patent rule" has been applied in Maryland to date, it follows from this that the manufacturer had no general duty either to warn of the danger or to equip the motorcycle with a protective device. *See Myers v. Montgomery Ward & Co.,* 253 Md. 282, 252 A.2d 855 (1969); *Patten v. Logemann Bros. Co.,* 263 Md. 364, 283 A.2d 567 (1971). *See also Miller v. Dvornik,* 149 Ill.App.3d 883, 103 Ill.Dec. 139, 501 N.E.2d 160 (1986); *Hunt v. Harley–Davidson Motor Co., Inc.,* 147 Ga.App. 44, 248 S.E.2d 15 (1978); *but see Nicolodi v. Harley–Davidson Motor Co.,* 370 So.2d 68 (Fla.App. 1979); *Taylor v. American Honda Motor Co., Inc.,* 555 F.Supp. 59 (M.D. Fla.1982).

## Breach of Warranty

■ In Count Two of his amended complaint, appellant asserted that the defendants "expressly and impliedly warranted to the general public, and to [appellant] in particular, that their motorcycles were safe, merchantable and fit for the use for which they were intended, and contained no undisclosed defects." Yamaha America and Yamaha Maryland generally denied those allegations, but nothing more about them appears in the record. There is no support or documentation for or against the existence of express warranties of the kind alleged. Nor is there any indication of the source of any implied warranty of safety. Md.Com.Law Code Ann. §§ 2–314 and 2–315 provide for implied warranties of merchantability and fitness for a particular use, but they impose no independent implied warranty of safety or against undisclosed defects.

When arguing against the defendants' motions to dismiss the original complaint, appellant urged that this count did not even arise under the Uniform Commercial Code. He specifically characterized it as "a breach of warranty arising in tort, seeking tort damages. It does not arise under Maryland U.C.C. at all." When asked by the court what it *does* arise under, counsel replied, "Common tort, common law." We see no indication in the record that appellant ever abandoned that notion in the Circuit Court. In his brief in this Court, he says nothing whatever about any express warranties but urges a cause of action for breach of implied warranties under § 2–314. As that was not argued in the Circuit Court, however, and as the issue raised in the Circuit Court has not been presented in the brief here, we shall not review any alleged error in the judgment entered with respect to Count Two.

## Strict Liability—§ 402A

■ Section 402A of the *Restatement (Second) of Torts* provides that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability for physical harm thereby caused

to the ultimate user or consumer" if the seller is engaged in the business of selling the product and the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. Maryland adopted this standard of liability, as stated in § 402A, in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976).

There is no dispute here that the defendants are engaged in the business of selling motorcycles of the type purchased by appellant. Nor is there any suggestion that the motorcycle was changed in any material respect after its purchase by appellant and before the accident. The issue is whether it was "in a defective condition unreasonably dangerous" to appellant. As the *Phipps* Court indicated, these are really two separate conditions—the product must be both in a defective condition and unreasonably dangerous when sold. Both of these conditions relate to, or are explained in terms of, consumer expectations:

> "As Comment g [to § 402A] explains, the requirement of a defective condition limits application of § 402A to those situations where 'the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.' An 'unreasonably dangerous' product is defined in Comment i as one which is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' "

*Phipps, supra,* at 344, 363 A.2d 955; *see also Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 497 A.2d 1143 (1985).

 We dealt more specifically with the question at hand in *Ziegler v. Kawasaki Heavy Industries*, 74 Md.App. 613, 539 A.2d 701, *cert. denied* 313 Md. 32, 542 A.2d 858 (1988).[5]

---

5. We also dealt with it in *Kremann v. Faunteroy* (S.T.1987, No. 383, Op. filed March 23, 1988). The Opinion in that case was filed as an unreported *per curiam* Opinion, but it was discovered by the Commerce Clearing House, Inc. and printed in its Products Liability

There, as here, the plaintiff purchased a motorcycle without special protection equipment to guard his lower extremities, was involved in a collision with an automobile from which he suffered injuries to his legs, and sued the manufacturer and distributors of the motorcycle. Although he initially included claims for negligence, breach of warranty, and misrepresentation in advertising, as the case reached us the only issue was whether he had made out a sufficient case of strict liability under *Restatement (Second)* § 402A.

After a discussion of the general principles of law governing the case, we concluded that the risk/utility test was applicable, i.e., that the court needed to balance "the utility of the design and other factors against the magnitude of that risk [inherent in the product]." *Id.* 74 Md.App. at 621–22, 539 A.2d 701 (quoting *Phipps, supra,* 278 Md. at 348, 363 A.2d 955). Quoting in part from *Troja v. Black & Decker Mfg. Co.,* 62 Md.App. 101, 104, 488 A.2d 516, *cert. denied* 303 Md. 471, 494 A.2d 939 (1985), we then stated, 74 Md.App. at 625, 539 A.2d 701:

> "In order to create a jury issue on Kawasaki's liability for a defective design, Ziegler was required but failed to produce evidence showing
>
>> 'the technological feasibility of manufacturing a product with the suggested safety device at the time the suspect product was manufactured; the availability of the materials required; the cost of production of the suggested device; price to the consumer, including that

Reporter at ¶ 11,850. The defendants have apparently concluded that its publication by CCH makes the Opinion no longer "unreported," and they have therefore cited it liberally throughout their brief as both precedent and persuasive authority. They are mistaken in their view. Md. Rule 8–114, which clearly bars the use of unreported opinions of this Court for such purposes, may not be circumvented merely because a commercial publisher decides to publish the opinion. If we file the Opinion as unreported and, as a result, it does not appear in the official Maryland Appellate Reports, it is subject to the Rule. Accordingly, we shall ignore all references to the *Kremann* Opinion and give it no weight whatever.

of the suggested device; and the chances of consumer acceptance of a model incorporating such features.' "

The last of these requirements—the chances of consumer acceptance—was of particular importance given the evidence actually adduced in *Ziegler*. As we pointed out in the Opinion, expert witnesses testified that not only would crash bars be ineffective in preventing leg injuries in collision cases but they might very well result in lower limbs being amputated as well as serious injuries to the upper parts of the body.

It is true, of course, that this case, decided essentially on the pleadings, cannot be controlled by the actual evidence produced in *Ziegler*. Compare, for example, *Camacho v. Honda Motor Co., Ltd.*, *supra*, 741 P.2d at 1248, where the record contained "some evidence to support the conclusion that Honda could have provided crash bars at an acceptable cost without impairing the motorcycle's utility or substantially altering its nature and Honda's failure to do so rendered the vehicle unreasonably dangerous under the applicable danger-utility test." We do note, however, that the amended complaint seems to take no account of the elements set forth in *Ziegler* that appellant would have to prove in order to establish liability on the part of the defendants. He alleges only that the defendants knew or should have known that structural modifications to the frame of the motorcycle "can be incorporated" into the design to prevent or lessen the severity of lower extremity injuries. There is nothing in the amended complaint to indicate that it would be cost-effective or commercially feasible to incorporate such modifications into the design, that any other manufacturer has done so, or that the modifications would make the vehicle a safer product.

This is not a technical pleading problem. The simple fact, obvious to any reasonable person, is that motorcycles are not designed with all of the safety features found in automobiles and that the operator of a motorcycle is at far greater risk of serious injury, to limbs as well as to other parts of the body, than is the operator of an automobile. If

this be regarded as a defect in design, it is a defect that is patent beyond cavil.

Given that undeniable fact, whether one uses the "consumer expectation" or the "risk-utility" test, the plaintiff has the burden of alleging and proving that the defendants acted unreasonably in placing the product, with that patent defect, into the stream of commerce. Even with "notice pleading," the plaintiff must do more than simply aver that unspecified safety devices "can be incorporated" into the design. Although this notion appears to be inconsistent with the view expressed in two Florida cases (*Nicolodi v. Harley–Davidson Motor Co., supra,* 370 So.2d 68 and *Taylor v. American Honda Motor Co., Inc., supra,* 555 F.Supp. 59), it is fully supported by decisions in Georgia, Illinois, Indiana, New York, and the Sixth Circuit. *See Hunt v. Harley–Davidson Motor Co., Inc., supra,* 248 S.E.2d 15; *Barnes v. Harley–Davidson Motor Co., Inc.,* 182 Ga.App. 778, 357 S.E.2d 127 (1987); *Miller v. Dvornik, supra,* 103 Ill.Dec. 139, 501 N.E.2d 160; *Bossert v. Tate,* 183 Ill.App.3d 868, 132 Ill.Dec. 166, 539 N.E.2d 729 (1988); *Miller v. Todd,* 518 N.E.2d 1124 (Ind.App.1988); *Rainbow v. Albert Elia Bldg. Co., Inc.,* 79 A.D.2d 287, 436 N.Y.S.2d 480 (1981), *aff'd,* 56 N.Y.2d 550, 449 N.Y.S.2d 967, 434 N.E.2d 1345 (1982); *Shaffer v. AMF, Inc.,* 842 F.2d 893 (6th Cir. 1988).

## Failure To Warn

In Count Four of his amended complaint, appellant iterated his charge that the motorcycle, absent a design modification to "prevent or minimize lower extremity injuries" was unreasonably dangerous. He asserted further that the defendants failed to warn him about the high degree of lower leg injuries or the availability of "sufficient design modifications to prevent or substantially lessen those injuries."

We have already concluded that the amended complaint fails adequately to allege that the motorcycle in question was unreasonably dangerous, and that suffices to sustain

 

the judgment with respect to Count Four. Apart from that, however, the duty of a manufacturer to warn applies only to inherent and hidden dangers—latent dangers not readily apparent to the consumer. *See Moran v. Faberge,* 273 Md. 538, 552, 332 A.2d 11 (1975); see also *Restatement (Second) of Torts* § 402A, comment j: "But a seller is not required to warn with respect to products ... when the danger, or potentiality of danger, is generally known and recognized." Here, as we have said, the danger not warned about was clear and obvious.

## CONCLUSION

For these reasons, and notwithstanding our conclusion that Yamaha Japan was properly served, we shall affirm the judgments entered below.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.