Michael B. **HAMBRICK**, an infant who sues by and through his father and next friend, Carson **HAMBRICK**, Plaintiff,

v.

**KEN–BAR MANUFACTURING COMPANY, Defendant.**

No. CIV.A. 7:01CV00177.

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 28, 2002.

Gordon Hoffman Shapiro, Shapiro & Kurtin, Roanoke, VA, Jonathan Seth Kurtin, for plaintiff.

Melissa Walker Robinson, Victor S. Skaff, III, Gentry, Locke, Rakes & Moore, Roanoke, VA, for defendant.

## MEMORANDUM OPINION

KISER, Senior District Judge.

Before me is the defendant's Motion for Summary Judgment filed January 11, 2002.

Plaintiff Michael Hambrick ("Hambrick") filed a complaint on March 13, 2001, alleging breach of implied warranty of fitness for intended purposes, negligent product design, and negligent manufacture by defendant Ken–Bar Manufacturing Company ("Ken–Bar"), a manufacturer and seller of go-karts and "fun karts" headquartered in Georgia. Hambrick alleges that design and manufacturing defects in the Ken–Bar Model D–680 "Streaker" fun kart caused him permanent physical injuries on July 31, 1998, after he overturned the cart in which he was driving.

The parties fully briefed the issues and were heard in oral argument, making this matter ripe for disposition. For the reasons set forth herein, the defendant's Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

*Facts and Procedural History*

Viewed in the light most favorable to the plaintiff, the facts are as follows: On July 31, 1998, plaintiff Hambrick was riding in a

Model D–680 "Streaker" go-kart or "fun-kart" manufactured by Ken–Bar Manufacturing Co. of Cornelia, Georgia.[1] The two-seater cart, which is powered by an 11 horsepower internal combustion engine, is just under seven feet in length, is 59 inches in height, and weighs 510 pounds. *See* Defendants' Motion for Summary Judgment ("Def."), Ex. G (Ken–Bar product brochure), p. 7 (color photograph and specifications of D–680). As standard equipment, the cart, which does not have a roof, includes a "brush bar," a tubular construction over the driver's seat that looks like a roll cage, but is designed only to "deflect loose vegetation from the path of the fun-kart operator and passenger, if any (on two-seat karts)." *Id.;* ASTM Safety Std., 1. It is not known whether consumers are provided with any warnings or instructions concerning the brush bar, or whether Hambrick assumed any particular purpose for the bar.

The particular sections of shaped steel tube that form the brush bar are connected together by U-bolts and brackets or flanges placed at several junctures, including two places on a cross bar just a few inches above and behind the heads of the driver and any passenger. *See* Def., Ex. E (color photograph of actual cart, with U-bolt exposed). Other cart manufacturers may use welded tube joints or sleeved connections that are bolted in such a manner that no bolt pieces project from the tubes. Plaintiff's Memorandum of Law in Opposition to Summary Judgment ("Pl."), Affidavit of David Kassekert, P.E.

("Kassekert Aff."), 3. However, the parties do not know of any government or industry standard specifying that the tubes be joined in any particular way. Def., Ex. C (Deposition of David Kassekert ("Kassekert Dep")), Tr. at 35; Def. at 6. On a new Ken–Bar cart, the U-bolts and brackets are covered by open-cell foam rubber. Def., Ex. G; Pl.Ex., David Kassekert, Engineer's Report (Forensic Engineering Services, Inc., November 8, 2001) ("Kassekert Rpt."), 4. The plaintiff's expert opines that "this type of padding is susceptible to damage from contact with other objects." *Id.* He claims that since 1995 there has existed a specification for roll cage padding requiring the padding to be covered with vinyl. Kassekert Dep., 34–35 (*citing* SFI Foundation, Inc., Quality Assurance Specification 12); Kassekert Rpt., 4.[2] The cart driven by Hambrick was approximately one-year-old, and had already lost some of the foam covering the U-bolt and flange over the passenger side of the cart. Def., Ex. E. If, as the defendants claim, the cart in which Hambrick was allegedly injured was sold with an optional seat belt, the particular purchaser of this cart did not buy one.

On July 31, 1998, Hambrick, then 14, was riding as a passenger in the cart, which was owned and driven by a member of his church youth group. Def., Ex. A (Deposition of Michael B. Hambrick ("Hambrick")), Tr. at 13–15. The youths were driving the cart on a flat, dirt path approximately eight or nine feet wide, with no memorable potholes, washouts, or ob-

---

1. "Go-cart" is apparently not a commercial term of art. "Fun-kart" is defined in the industry as a gas powered motorized vehicle with four wheels sold commercially as consumer goods and intended for private personal recreation by consumers for off-road use on suitable terrain, as recommended by the manufacturer, at speeds over 12 m.p.h., but not exceeding 40 m.p.h. Defendant's Motion for Summary Judgment, Ex. H (ASTM F 1928–

98, "Standard Safety Guide for Consumer Recreational use of Fun–Karts" (March 1999)) (hereafter "ASTM Safety Std."), p. 1.

2. This specification is not in the record. The document Kassekert has produced is a 1999 SFI specification for the *testing* of roll cage padding, and does not advocate or mention protective vinyl covers. *See* Kassekert Dep., Ex. E.

structions. Hambrick, 15–19. Hambrick had ridden in the cart once before. Hambrick, 22. He says he didn't notice any padding missing from the brush bars or any protruding bolts before he got into the cart, though he wasn't looking for any at the time. Hambrick, 26. He also doesn't remember how the cart he was riding in flipped over, how many times it rolled, or when he was thrown out of the cart, though he remembers the accident happened on a flat, dirt section, at the end of the path where the boys had to turn around, and that the cart rolled to its right side "very quickly." Hambrick, 20, 28, 34–35. He denies that the youths had adjusted the speed of the go-cart's governor, drove too fast, attempted to "make doughnuts," leaned out, or did anything else unusual to increase the chances of overturning. Hambrick 30–34. At some time during the accident, he punctured his forearm, sustaining permanent injury. When exactly this happened in the course of the accident, he can't recall, but he does state that afterward he found pieces of his own flesh on the exposed U-bolt and flange, and that there was no other sharp objects on the path which could have caused his injury. Hambrick, 37–43 and Dep. Ex. 6 (photograph with area circled where flesh was found). Hambrick does remember that when the cart began to tip he tried to hold himself in by putting his arms up to the supports above his head and pressing his palms against the undersides of the brush bars. Hambrick, 56–59.

Plaintiff's expert Kassekert asserts that the fun-kart was designed for off-road operation, and that it was foreseeable that the cart could "trip" and roll over. He asserts the following design defects: (1) the lack of passenger restraints sufficient to keep the occupants inside a protected area of the cart during roll over; (2) the construction of the brush bar, which, allows exposed U-bolts and flanges to come into contact with passengers during roll overs; (3) the proximity of the brush bar to the passengers, which allows portions of occupants' bodies to contact it during roll overs; and (4) the lack of covered padding over the brush bar connections, which makes the padding susceptible to damage during operation and makes occupants susceptible to injury from coming into contact with the exposed brush bar. Kassekert Rpt., 5. To the defendant's assertions that the cart was not maintained in a proper mechanical condition, Kassekert responds that the roll over itself could have caused a number of the conditions observed. At any rate, argues Kassekert, Hambrick's injuries would not have been caused by these conditions. See Def., Ex. F (Wally A. James Letter of October 2, 2000 ("James Rpt.")), p. 2 (listing conditions in need of repair which would not have existed at time of manufacture); Kassekert Rpt., 3–4.

Because there appears to be no published government or industry standard against which the defendant's design can be judged, the plaintiff has produced evidence that most consumers would consider the protruding U-bolt threads and flange to be unreasonably dangerous. See Pl.Ex. (Affidavit of Julie Edell, Ph.D ("Edell Aff.")); Def. Ex. D (Deposition of Julie Edell ("Edell Dep.")). To this end, the plaintiff employed a polling firm to survey 100 shoppers at malls in Charlottesville and Lynchburg. See Edell Dep., Ex. 1–3 (questionnaire and tabulations). No representatives of the polling firm were deposed by the defendant; however, the plaintiff asserts the consumers selected to participate were not selected based upon interest in, experience with, or knowledge of, fun-karts. "They were simply people over the age of 14, who might have previously purchased a fun cart, might purchase one at some time in the future, [or] might never purchase, drive or ride in a fun-kart." Edell Aff., 3. The survey asked various

questions concerning the features on the fun-kart already described, including consumers' expectations that these features would protect them from various injuries. Edell, an associate professor at Duke who has taught and wrote on survey research methodology, analyzed the results. Of particular importance to her conclusion that most consumers would consider the cart's U-bolt and flange to be unreasonably dangerous were answers to two of the survey's 26 questions, which asked:

> 23. If the cart design included sharp edges or pointed objects that could injure an occupants, would you consider this an unreasonable design defect?
>
> 26. (Pointing at flange) Is this an unreasonable design defect?

Edell Aff., 3 (*quoting* Edell Dep. Ex. A (survey questions)). According to the survey, 64% of participants who had previously driven a go-cart answered "Yes" to Question #26. Sixty-six percent of those who had never driven a go-cart also answered yes to the same question. *Id.* Apparently, 87 % of all participants also answered "Yes" to Question #23. Edell Dep. Ex. B (survey with totals noted), Ex. C (raw data tabulations).

Edell has also testified to the statistical validity of her assessment. Edell reports that she did not find the above two questions "inappropriate, biased, or misleading." Edell Aff., 3. Against separate criticism that she has no experience in mechanical design or go-carts, she considers such experience irrelevant to her particular task as a surveyor, which was only to determine consumer expectations. According to Edell, "the methods used do not vary based upon the topic being surveyed." *Id.* (*quoting* Alreck and Settle, *The Survey Research Handbook* (1985)). In previous litigation for which Edell has been employed, she has, for instance, derived a community standard of obscenity in a federal pornography prosecution, and assessed the reasons why consumers drink malt liquor instead of beer for a Department of Justice antitrust suit. Yet "[i]t was not necessary to be a pornography expert to design or assess the validity of the survey research.... Industry knowledge has never been a prerequisite for my work as a survey research expert, because the methods and techniques used to assess the research are not dependant upon the topic under investigation." Edell Aff., 2. To the defendant's strenuous objections that Edell played no part in drafting or asking the survey questions, and that she in fact knows very little if anything about the polling firm or how the questions were administered, Edell testifies that such a division of labor and information between surveyor and analyst is critical to the validity of the results, and in fact is customary in survey research. Edell Aff., 2. Says Edell:

> If I had actually written and administered the questionnaire, I would not be able to give an unbiased assessment of the validity of the research, since I would have my professional reputation at stake in the conduct of the research. As with peer review in the academic journal publication process, we take the word of the person conducting the research as to whether the questions on the survey were the questions to which the responses were given, and the data that is reported are the actual responses given by the respondents.

*Id.*

## II STANDARD OF JUDGMENT

### A. Summary Judgment

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation. *Hooven–Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir.2001). Mere speculation by the non-movant cannot create a genuine issue of material fact. *Cox v. County of Prince William,* 249 F.3d 295, 299 (4th Cir.2001). A material fact is one whose existence or non-existence could result in a different jury verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. National Cable Advert., L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995). The function of the judge at the summary judgment stage is not to determine the truth of a matter or to weigh credibility but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party. *JKC Holding Co., LLC v. Washington Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir.2001) (*citing Anderson,* 477 U.S. at 250, 106 S.Ct. at 2505).

### B. Admissibility of Expert Opinions [3]

■■■ "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. When faced with a proffer of expert scientific testimony, a trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the fact at issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The most relevant factor is: (1) whether the method is in fact scientific, i.e., capable of empirical verification ("a key question"). Contributing factors include: (2) whether the method has been subject to peer review or publication; (3) known or potential rate of error; and (4) general acceptance within the scientific community. 509 U.S. at 593–594, 113 S.Ct. 2786. Even when an expert is eminently qualified to opine on an issue, the expert must still actually *apply* a reliable methodology to the facts, drawing upon his specialized knowledge by testing the product or referring to expert literature, in order for his proffer to be admissible. *Oglesby v. General Motors Corp.,* 190 F.3d 244, 247–251 (4th Cir.1999) (where qualified expert merely looked at

---

**3.** During oral argument, the plaintiff stated that he would not be relying upon an earlier expert opinion by Gary Derian as part of the summary judgment record. Accordingly, I do not address Ken–Bar's objections to Derian's qualifications and opinions in the Discussion below, I do not consider his testimony and report in rendering a decision as to Ken–Bar's motion.

broken pipe connection, took physical measurements, and photographed the item, his opinion why it broke was "mere speculation and conjecture," therefore inadmissible, where he did not know how the particular part was manufactured, or of what material it was made, and he performed no tests or calculations). *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171–1173, 143 L.Ed.2d 238 (1999) (where well-experienced expert merely employed syllogistic reasoning to determine that a blown out tire was defective, starting from the premises that a properly manufactured blown out tire stays on its rim, and the tire in his case didn't, his methodology of simply relying upon a visual inspection and experience was unreliable). However, "at bottom, the court's evaluation is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Oglesby,* 190 F.3d at 250.

## III DISCUSSION

■ The parties agree that Virginia law governs the present dispute. Under Virginia law, plaintiffs asserting negligent design and manufacture claims must make a threshold showing that: (1) an unreasonably dangerous condition (2) existed when the goods left the defendants' hands, and that (3) the product was not substantially changed after time of sale. *Logan v. Montgomery Ward & Co.,* 216 Va. 425, 219 S.E.2d 685, 687 (1975); *Bly v. Otis Elevator Co.,* 713 F.2d 1040, 1043 n. 2 (4th Cir.1983). The plaintiff must also (4) demonstrate with "reasonable certainty" that the defect caused the plaintiff's injuries. *Stokes v. L. Geismar, S.A.,* 815 F.Supp. 904, 907 (E.D.Va.1993).

■ "In determining what constitutes an unreasonably dangerous defect, a court will consider safety standards promulgated by the government or the relevant industry, as well as the reasonable expectations of consumers." *Alevromagiros v. Hechinger Co.* 993 F.2d 417, 420–421 (4th Cir.1993) (*citing Sexton v. Bell Helmets, Inc.,* 926 F.2d 331, 337 (4th Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991)). The Fourth Circuit in *Alevromagiros* and *Sexton* both recognized that the reasonable expectations of consumers may provide the sole criteria for unreasonable danger. "[A]n examination of societal standards at any given point in time usually reveals an expectation that balances known risks and dangers against the feasibility and practicability of applying any given technology." *Sexton,* 926 F.2d at 337. Consumer expectations, which may differ from government or industry standards, "may be proved from evidence of actual industry practices, knowledge at the time of other injuries, knowledge of dangers, the existence of published literature, and from direct evidence of what reasonable purchasers considered defective at the time." *Id.* Nonetheless, an individual's subjective expectations are insufficient to establish what degree of protection society expects from a product. *See Redman v. John D. Brush and Co.,* 111 F.3d 1174, 1181 (4th Cir.1997) (distributor's testimony that based upon a safe's advertisement, warranty, and appearance, he expected it would protect valuables better was insufficient by itself to establish reasonable consumer expectations).

Under certain circumstances, an unreasonable dangerous product that causes injury will not subject a manufacturer to liability. The Fourth Circuit has held that "an open and obvious lack of safety features does not constitute an actionable defect." *Higgins v. American Honda Motor Co., Inc.,* 974 F.2d 1331, 1992 WL 212147, *4 (4th Cir.1992) (unpublished) (*citing Shaffer v. AMF, Inc.,* 842 F.2d 893 (6th

Cir.1988); *Pressley v. Sears–Roebuck & Co.*, 738 F.2d 1222, 1223 (11th Cir.1984); *Toney v. Kawasaki Heavy Indus.*, 763 F.Supp. 1356 (S.D.Miss.1991)). A risk is open and obvious "if the person using the product is or should be aware of the risk." *Austin v. Clark Equip. Co.*, 48 F.3d 833, 836 (4th Cir.1995). For instance, "Courts have found the lack of safety features on motorcycles and the incident risk of bodily harm to be 'patent beyond cavil.'" *Higgins*, 1992 WL 212147 at *4 (*quoting Nicholson v. Yamaha Motor Co.*, 80 Md.App. 695, 566 A.2d 135, 147 (1989), *cert. denied*, 318 Md. 683, 569 A.2d 1242 (1990)). In *Higgins*, the Fourth Circuit applied this rule to a three-wheeled ATV which obviously had no rollover protection. The court held that the risk of bodily injury from striking horizontal wires while riding the ATV was "open and obvious" enough to constitute a risk that the operator assumed whenever he rode the vehicle. *Id.*

■ In other instances, "[w]hen a customer exercises an option to purchase a product without a safety feature, it is axiomatic that the manufacturer should not be held liable for damages which that safety feature may have prevented." *Austin*, 48 F.3d at 837 (applied to forklifts without audible or visual backup warnings) (*quoting Butler v. Navistar Int'l Transp. Corp.*, 809 F.Supp. 1202, 1209 (W.D.Va.1991) (applied to farm tractor without a rollover protection system)). Although this axiom seems to apply narrowly to situations in which the lack of such an option creates an open and obvious danger, or where, as in *Butler*, "the customer chooses to delete the safety feature so the product can be put to some use that the feature would have prevented," 809 F.Supp. at 1209, the plaintiffs in this case do not attempt to limit its applicability. Instead, they argue that the rule simply does not apply to the facts of this case.

. With the exception of *Austin* and *Butler*, the parties do not dispute the applicable precedents. The defendants claim that there is insufficient evidence to raise a genuine issue of material fact concerning the cause of Hambrick's injury. They claim that, as a matter of law, Ken–Bar may not be held liable due to the open and obvious nature of the risk of accident posed to the fun-kart's lack of a rollover protection system, the lack of a seatbelt, and the visibly protruding U-bolt and flange. Ken–Bar argues that, under *Butler* and *Austin*, the purchaser's failure to buy the seatbelt alone absolves the manufacturer of liability. On the issues of causation and unreasonable danger, for which there are obviously disputed issues of material fact, the defendants challenge the admissibility of Hambrick's expert opinions under *Daubert*.

A. *Plaintiff's expert David Kassekert, P.E., is qualified to testify in the form of an opinion that will assist the trier of fact to understand the evidence, and his method and application are is sufficiently reliable under Daubert and Oglesby.*

■ Kassekert's qualifications and relevant experience in motor vehicle design and safety are significant. *See* Kassekert Report, end pages (including curriculum vita and list of previous testimony). He has earned a master's degree in mechanical engineering from Purdue and completed a postgraduate program in automotive engineering at the Chrysler Institute of Engineering. He is registered as a Professional Engineer in Pennsylvania and Ohio. For approximately twenty years after he earned his postgraduate degree, he worked as an engineer for Chrysler, B & M Industries, Westinghouse and others, designing engine and drive train components. His work has also included providing engineering support for corporately

sponsored drag racers, NASCAR racers, and other sports car racing, in which his duties included the design and supervision of construction on roll bars, roll cages, driver restraints, and other safety systems. Kassekert Aff., 1. He also reports that he has designed, constructed and operated numerous personal racing and hobby vehicles over a period of thirty years. Kassekert Aff., 2. From 1994 through the present, he has attended the Society of Automotive Engineers' annual accident reconstruction and automotive safety seminars. Kassekert Rpt., 12. He has given trial and deposition testimony in approximately 50 cases since 1996, approximately five of these having to do with fun carts or go carts. Def., 8. Against this background, Ken–Bar's criticism that Kassekert has never worked in the fun cart industry, and is not familiar with fun kart organizations, might be applied to the weight of his expert testimony in the present case, but it is not disqualifying.

Kassekert's particular opinions are the result of reliable application of valid methodology or literature to the facts of the case. His opinion that rollover was foreseeable for this fun-kart, despite its low center of gravity, is backed by research showing that all vehicles can "trip" (slide sideways until the force of friction on the tires builds up to tip the vehicle). Pl.Ex. (Cooperrider, et al.) Testing and Analysis of Vehicle Rollover Behavior (Failure Analysis Associates, Inc., no date given) (surveying research on trip models); Meyer, et al., Accident Reconstruction of Rollovers–A Methodology" (S.A.E.2001) (explaining methodology by which tripping rollover can be determined at accident scenes)). He supports his contention that ejection was foreseeable with Consumer Product Safety Commission Statistics showing that between 22–35% of the 125,-900 go-kart injuries reported between 1985 and 1996 were due to ejections or rollovers. Kassekert Report, 2. Kassekert in-

spected the subject vehicle himself, and compared it to the construction used in other vehicles in the field in order to render an opinion on feasible alternate designs. His experience in the racing industry qualifies him to opine that the brush bar surrounding the cart's occupants looked like, but was not, a functioning roll cage, an opinion which Ken–Bar does not really dispute anyway. Kassekert's experience also qualifies him to state, in general, what kinds of features would be necessary in order to equip this fun kart with a rollover prevention system that did not allow the occupant to be ejected or to come into contact with sharp objects on the frame of the cage. In general, I find his conclusions to be empirically verifiable, subject to peer review, and generally accepted within the engineering community. Though he presumably could have done more to verify the plausibility of his opinions, e.g., with product testing, modeling, or more research of practices and literature within the fun-kart industry, that is a matter of weight for the defendants to attack on cross-examination, but does not preclude admission under *Daubert* and *Oglesby.*

*B. The physical cause of Hambrick's injuries is a genuinely disputed issue of material fact, if not conceded.*

 The defendants claim that Hambrick can only be speculating as to whether the U-bolt and flange joint on the fun kart's brush bar punctured his arm. They argue that not only were there no eyewitnesses to the moment of injury (including Hambrick himself, who can't remember it); Hambrick may not even have been in the cart when the injury happened. "Viewed in a light most favorable to the plaintiff, all that is known is that his arm at some point came in contact with a flange located at the top of the brush bar of the go-kart and illustrated in the photographs marked as

'Exhibit E.' " Def., 3. This argument fails to appreciate the plaintiff's theory of the case. According to that theory, it does not really matter whether Hambrick was still within the brush bar assembly when his arm impacted the U-bolt. According to Kassekert, only negligently inadequate restraints allowed Hambrick to be thrown from the cart, given the foreseeability of rollover and ejection in the absence of sufficient restraints. If his injury occurred after ejection, the injury was due to the combination of the dangerously protruding joint *and* the lack of restraints. If the injury occurred before ejection, it was caused by the dangerous proximity of the U-bolt and flange to the occupant's body.

C. *Given the facts as developed to this point, the purchaser's purported failure to buy a seatbelt for the funkart does not absolve Ken–Bar from liability.*

 The plaintiff's theory of the case is that a seatbelt would not have prevented the injury, no matter how it actually occurred. If the injury occurred while Hambrick was still seated within the vehicle, the design cause of the accident was the proximity of the dangerously protruding U-bolt and flange to the occupant's body, and the issue concerning the seatbelt is moot. Furthermore, "[i]t is also necessary to design the roll cage large enough so that all parts of the restrained occupants remain inside the protected area. The cage on this kart is not large enough to protect the occupants in this fashion." Kassekert Rpt., 4. Even if a seatbelt would have kept Hambrick attached to the seat, it would still have allowed his arms to fly up and contact the U-bolt. The possibility that Hambrick was ejected before he contacted the U-bolt is also irrelevant. If some other joint besides a U-bolt and flange had been used to construct the brush bar, or if a vinyl-coated padding had covered the U-bolt and flange, the accident would not have caused puncture and permanent injury. Kassekert Rpt., at 4–5. Unlike the declined options in *Austin* and *Butler*, a seatbelt would not have saved Hambrick.

D. *There is a genuine issue of fact whether the cart's defects were open and obvious.*

In the defendant's view, the open and obvious risks which Hambrick ignored were: (1) the cart's lack of a rollover protection system, (2) the U-bolt and flange construction, and (3) the lack of a seatbelt. The first is just not obvious. To the untrained eye, there appears to be no difference between the tubular construction surrounding the cockpit of this vehicle and a "roll cage," the latter offering some protection to occupants upon rollover. The term "brush bar" is a term of art not known to the general public. "To an uninformed individual, it resembles a roll cage." Kassekert Rpt., 4. Hambrick himself apparently thought the brush bar assembly was a roll cage, stating in deposition that the difference between the D–680 and the go-carts he had driven at elsewhere is that the D–680 "has a bigger roll cage." Hambrick at 53:18–24. Nowhere does he state that he received any warning to the contrary.

Similarly, I do not find the U-bolt and flange construction and placement to present an open and obvious risk of puncture. Hambrick stated in deposition that, prior to getting into the cart, he took no notice of it at all. Hambrick does not know whether the offending joint at issue was exposed as it appears in the photograph at Ex. E before the accident. Even if it was, I find it hard to believe that the risk it posed is anywhere near as obvious as the risk of injury posed by rollover of an open-mount motorcycle, ATV, or tractor. At the very least, the obviousness of this risk is a jury issue.

Finally, Hambrick may be said to have assumed a risk by riding in a vehicle without a seatbelt. However, that risk was one of head injury or ejection, not puncture by a component of the vehicle which was situated behind the occupant. For reasons already stated, if the plaintiff's expert is correct, the lack of a seatbelt was not the proximate cause of Hambrick's particular injury. Thus, *Austin* and *Higgins* simply would not apply to the facts of this case.

E. *Plaintiff's expert Julie Edell, is qualified to testify in the form of an opinion that will assist the trier of fact to understand the evidence, and her testimony at this point must be deemed sufficiently reliable under Daubert and Oglesby.*

 Edell has been offered as an expert on survey research-particularly on the analysis of survey results. Edell Aff., 1. Survey research is used to assess people's perceptions and opinions on a variety of topics. Edell Aff., 2. In this case, Edell interprets survey results conducted by plaintiff's pollster to express reasonable consumer expectations concerning funkarts and the particular features on the D–680 cart. She also expresses an opinion concerning the validity of the survey itself, but only to the limited extent that she does not find crucial questions to be biased or misleading. Edell Aff., 3. Edell's representations concerning her background are not disputed. She has been trained in survey research methodology in the Ph.D program she completed at Carnegie–Mellon, and has taught research methods to MBA and Ph.D students at Duke. She has also co-authored a publication entitled, "Criteria for Assessing Empirical Research on the Effects of Marketing Communications," published in Bloom and Grundlach, *Handbook of Marketing and Society* (2001). The article provides a checklist of criteria used to assist survey research. Her expertise involves: (1) knowing how to assess whether a survey is of a sufficient size to support generalized conclusions; (2) knowing how to determine whether a sample of people is representative of the population; and (3) knowing proper techniques for analyzing whether different subsets of consumers have different perceptions or opinions. Edell Aff., 1. She has worked as an expert for the U.S. Justice Department in criminal and civil cases, as well as for law firms conducting litigation in federal courts. Edell Aff., 2.

 Significant to Ken–Bar's *Daubert* challenge is the fact that Edell also offers testimony concerning the reliability and acceptance of her methodology. This testimony is the only such evidence before me on the subject. Responding to Ken–Bar's challenge that Edell is largely ignorant concerning how the plaintiff's survey was conducted, and has had negligible conduct with the polling firm, Edell testifies that this is standard practice in survey research, and is even required in order to preserve the validity of her analysis. Edell Aff., 2–3. The defendants may have persuasively pointed out Edell's ignorance concerning the authorship and conduct of the survey. However, this ignorance is justified by Edell, citing authority on the issue, and her justification is not controverted with authority by the defendants. Given that Edell's cited authorities on the issue have been published, presumably after peer review, and seem to espouse accepted method taught to university postgraduates, I find it sufficiently reliable to warrant admission of her testimony under *Daubert.*

While Ken–Bar argues correctly that the survey itself could have been conducted in any number of misleading ways, that does not appear to have been Edell's concern or responsibility, beyond her review of the questions and sample groups. Ken–

Bar had ample opportunity to discover how the survey was conducted, to depose pollsters and participants, and to offer expert testimony concerning the survey's validity. Ken–Bar chose to leave the record silent on the subject. Edell has testified that the working presumption in survey research is to accept the results of a survey as accurate representations of participants' responses. Edell Aff., 2. With no expert rebuttal evidence yet on record, I find it appropriate to honor that presumption.

 The defendants have also challenged the admissibility of the survey results as hearsay. This argument fails to inhibit Edell's testimony for two reasons. First, Fed.R.Evid. 703 clearly states that "the facts and data [relied upon by an expert] need not be admissible in evidence in order for the opinion or inference to be admitted," as long as the data is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Even if particular data is otherwise inadmissible under the Federal Rules, a trial court may still admit them into evidence if "the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." *Id. See, e.g., The Learning Network, Inc. v. Discovery Communications, Inc.*, 153 F.Supp.2d 785, 789 (D.Md. 2001) ("[t]he question here presented is whether the asserted defects in the Ostberg survey are so great as to warrant exclusion rather than grist for the mill of cross-examination, rebuttal evidence, and jury evaluation."). It almost goes without saying that survey researchers must rely upon surveys in order to render opinions.

In this case, the survey's probative value is essential for understanding and evaluating Edell's opinion. Furthermore, any unfairly prejudicial effect this survey poses to the defendants can be cured by the opportunity to question the pollsters and participants at trial, and to present expert testimony in rebuttal.

Secondly, the objection ignores the fact that courts routinely admit surveys for various purposes. *See, e.g., Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir.1996) (evidence of genericness in trademark case may come from consumer surveys); *Cable News Network L.P., L.L.L.P. v. CNNews. com* 177 F.Supp.2d 506 (E.D.Va.2001) (actual economic harm in a trademark dilution case may be demonstrated by a consumer survey designed to demonstrate that consumers or customers in a relevant market mentally associate the offending name with the famous mark, and to determine further consumer impressions from which actual harm and cause might be inferred) (*citing Ringling Bros. Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 452 (4th Cir.1999)); *Alston v. Virginia High School League, Inc.*, 144 F.Supp.2d 526, 539–540 (W.D.Va.1999) (survey conducted on behalf of defendant was admissible over hearsay objection in Title IX suit based on allegedly discriminatory scheduling of girls' sports for the purpose of establishing how girls felt about the scheduling of girls' and boys' sports; furthermore, survey results were admissible on ground that they formed the basis of expert testimony) (*citing* Fed.R.Evid. 703, 803(3)). Until the defendants offer some showing of the inherent unreliability of the survey, the survey can be admitted, if only because it forms the basis of Edell's testimony [4].

---

4. I take notice that Questions 23 and 26 of the survey ask participants to offer an opinion on the ultimate issue ("unreasonable design defect"). Offered as a keystone of the plaintiff's showing, the answers to these questions, as legal conclusions, are not impressive. I note, however, that the survey also asks a number of more specific questions going to consumers' impression of protection and unreason-

Finally, Edell's testimony satisfies *Oglesby* in that it appears to apply a valid method to test results concerning a factual issue in this case. Edell's opinion concerning consumer expectations is not based upon her own impressions of the fun-kart, but upon the impressions of the surveyed consumers, the number of which she considers to be valid to reflect the expectations of society at large. Therefore, her opinion testimony is admissible, and raises a genuine issue of material fact concerning the unreasonable dangerousness of the D–680 fun kart.

## IV CONCLUSION

For the foregoing reasons, the defendants having failed, on the record as developed to date, "to show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," the motion for summary judgment is **DENIED**.

An appropriate Order shall issue.

able danger, and for this reason I hold that the survey lays a foundation for Edell's testimony, at least to the extent the survey has been examined to date.