# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

No. 02-3188

JOHN LUELLEN,

*Plaintiff-Appellant,*

v.

CITY OF EAST CHICAGO, ROBERT A. PASTRICK, in
his official capacity as Mayor of the City of East
Chicago, FRANK ALCALA, individually and in his
official capacity as East Chicago Police Chief, et al.,

*Defendants-Appellees.*

————————

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 00 C 40—**Allen Sharp**, *Judge.*

————————

ARGUED APRIL 15, 2003—DECIDED NOVEMBER 18, 2003

————————

Before FLAUM, *Chief Judge*, and RIPPLE and WILLIAMS,
*Circuit Judges.*

RIPPLE, *Circuit Judge.* John Luellen brought this action
pursuant to 42 U.S.C. § 1983 and Indiana state law for
alleged constitutional violations and other torts as a result
of the search of his vehicle and of being placed on adminis-
trative leave without a hearing. The defendants moved for
summary judgment on all of Mr. Luellen's claims, and the
district court granted the defendants' motion. Mr. Luellen
appealed. We now affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1. Events of April 18, 1999

John Luellen was Chief Inspector for the East Chicago Fire Department ("ECFD") in April 1999; Mr. Luellen also was a supporter of Stephen Stiglich, a mayoral candidate who was challenging incumbent Robert Pastrick in the May 1999 East Chicago Democratic primary.

On April 18, 1999, Mr. Luellen picked up his girlfriend, Yvette Millender, who was attending a house party for local political candidates at the home of Lilly Branford-Brown. When Mr. Luellen arrived, there were only about five people left at the party. He stayed there for about fifteen minutes.

That evening, a confidential informant ("CI") called the East Chicago Police Department ("ECPD") and informed Lieutenant Ricardo Chavarria that Mr. Luellen "was at a house party and he was getting people's absentee ballots." Chavarria Dep. (8/14/01) at 22. The CI named and described Mr. Luellen, his city-owned vehicle and the bag in which the ballots were placed. *See id.* at 38 & Ex.1. Lt. Chavarria had known the CI for several years and considered the CI to be reliable.

Lt. Chavarria contacted ECPD Chief, Frank Alcala, at home and related the information received from the informant. Chief Alcala referred Lt. Chavarria to Thomas Ryan, the ECPD's legal counsel who could better advise Lt. Chavarria concerning the legality of Mr. Luellen's actions. In a series of conversations, Ryan told Lt. Chavarria that he believed that the police had enough information to search Mr. Luellen's vehicle based on the mobile conveyance exception to the warrant requirement of the Fourth Amend-

ment. However, in order to escape inevitable criticism, Ryan also advised Lt. Chavarria to determine whether the city had a policy regarding its vehicles and whether there was another key for the city vehicle in question. While Lt. Chavarria was tracking down this information on the city's policy, he left two other officers, Louis Arcuri and William Jansky, at Mr. Luellen's home to conduct surveillance.

Lt. Chavarria spoke to Howard Vanselow, the assistant chief in charge of maintenance for the ECFD, who also was the acting chief while ECFD Chief, James Dawson, was out of town. Asst. Chief Vanselow told Lt. Chavarria that he (Vanselow) could get a key to the vehicle. Asst. Chief Vanselow later met Lt. Chavarria with the key at Mr. Luellen's residence.[1]

Before Lt. Chavarria searched the trunk, he knocked on Mr. Luellen's door, but there was no response. Asst. Chief Vanselow then knocked as well; Mr. Luellen eventually opened his second-floor window. When Asst. Chief Vanselow informed Mr. Luellen that the trunk of the vehicle was going to be opened, Mr. Luellen responded that he was going to get in touch with his lawyer.[2]

---

[1] When Lt. Chavarria called the ECFD, he requested to speak to Chief Dawson. Chief Dawson was paged; however, in the meantime, Lt. Chavarria spoke with Asst. Chief Vanselow. At some point during the evening, Chief Dawson returned a call from the police department. Chief Dawson spoke to Lt. Chavarria who said that the police "suspected some wrongdoing" and "mentioned something about some ballots" in Mr. Luellen's vehicle. Dawson Dep. at 58. Chief Dawson gave Lt. Chavarria permission to search the vehicle. *See id.* at 59.

[2] The following day, Mr. Luellen went to see an attorney who prepared an affidavit for Mr. Luellen to sign. It stated that the bag

(continued...)

Asst. Chief Vanselow then opened the trunk at Lt. Chavarria's request. Inside the trunk was a bag labeled "Lake County Voters Registration Board," which contained both sealed and unsealed absentee ballots. Lt. Chavarria then informed Mr. Luellen that they were confiscating the bag.

At the station, the contents of the bag were inventoried, and the inventory revealed several completed absentee ballots and several applications for absentee ballots. On the morning of April 19, 1999, the evidence was turned over to the Lake County Sheriff's Department so that it could conduct a more thorough criminal investigation.

## 2. Suspension

Based on his actions of April 18, 1999, Mr. Luellen was placed on administrative leave from the Fire Department beginning on April 21, 1999. Specifically, on that date, Chief Dawson informed Mr. Luellen accordingly:

Please be advised that I have been informed by Fire Department Attorney Michael W. Bosch that on April 20, 1999, the Lake County Sheriff presented evidence of election law violations to the Lake County Combined County Election Board and Board of Registration. The County Sheriff and his legal advisor advised the Board that they believed the facts surrounding items confiscated from your fire department vehicle constituted

---

[2] (...continued)
contained ten absentee ballots that Mr. Luellen had collected for mailing. Later, in his deposition, Mr. Luellen stated that the ballots had been given to him to be passed on to someone else. *See* Luellen Dep. at 45-46.

evidence of the commission of a felony. The Election Board has referred this evidence to both the Lake County Prosecutor and the United States Attorney for the Northern District of Indiana for further investigation.

While you have not been convicted in any court yet, this conduct that the sheriff considers a felony is certainly conduct unbecoming an officer. Accordingly, by the power invested in me as the Chief of this Department, you are hereby suspended from duty. Pursuant to the former [Ind. Code] 19-1-37,5-7, I shall present this suspension to the Board of Public Safety for confirmation on Thursday, April 22, 1999 at 11:00 a.m. in the Board's hearing room. If the Safety Board confirms your suspension, you will have ten (10) days to file with the East Chicago Fire Civil Service Commission a written demand for an investigation, whereupon the Commission shall conduct an investigation.

Pursuant to [Ind. Code] 36-8-3-4, the Safety Board may place you on administrative leave until the disposition of criminal charges. Your administrative leave may be with or without pay as determined by the board but, I do intend to recommend you be suspended with pay.

R.84, Ex.4.

In another memo issued on that day, Chief Dawson also informed Mr. Luellen that "the Fire Department is conducting an internal investigation about an incident that occurred on April 17, 1999. You are allegedly involved in this incident. At the conclusion of this investigation there may be possible charges filed against you." *Id.*, Ex.5.

Mr. Luellen did not attend the confirmation hearing on Thursday, April 22, 1999, nor did he take any other action to

challenge his suspension. He remained on paid administrative leave until January 15, 2001. During this time, he received his base pay. However, Mr. Luellen did not receive either overtime pay or "on-call pay"—an additional yearly sum paid to fire inspectors for being available to respond when requested by an assistant chief. Luellen Dep. at 53. No criminal charges were ever filed against Mr. Luellen.

## B.  District Court Proceedings

Mr. Luellen brought this action against the City of East Chicago, its Mayor—Robert Pastrick, Mayor Pastrick's son—Kevin Pastrick,[3] Chief Dawson and Chief Alcala for alleged violations of his rights under the First, Fourth and Fourteenth Amendments. By way of relief, Mr. Luellen sought "a declaratory judgment determining that the challenged actions of the defendants violate [his] rights," reinstatement, backpay and damages. R.1 at 6.

The defendants moved for summary judgment, which the district court granted. With respect to Mr. Luellen's Fourth Amendment claim, the district court held that the moving vehicle exception to the warrant requirement applied. The court explained that "[u]nder this exception, police officers may search a vehicle without a warrant if they have probable cause to believe it contains contraband or evidence of

---

[3]  Although Kevin Pastrick was named as a defendant below and consequently is a party to this appeal, Mr. Luellen makes no argument concerning Kevin Pastrick's involvement in this action or the legal basis for holding Kevin Pastrick liable for the alleged constitutional violations. We therefore affirm the judgment of the district court in favor of Kevin Pastrick with respect to all of Mr. Luellen's claims.

crime." R.115 at 12. Furthermore, the court continued, "[p]robable cause to search a vehicle under the automobile exception can come from information obtained by a confidential informant." *See id.* at 13 (citing *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998), and *United States v. Talley*, 108 F.3d 277, 281 (11th Cir. 1997)). The court determined that the detailed information provided by the CI, combined with Lt. Chavarria's personal knowledge of the CI's reliability, provided probable cause for a search of the vehicle.

The district court further held that, even if there was not probable cause to search the vehicle, the involvement of Chief Dawson and Chief Alcala was not sufficient so as to subject them to liability under § 1983. According to the court, Lt. Chavarria testified that he would have opened the trunk even absent Chief Dawson's permission; consequently Chief Dawson's permission was not a factor in the alleged Fourth Amendment violation. As well, the district court found that Chief Alcala's referral of Lt. Chavarria to Ryan for advice also was not sufficient personal involvement to impute § 1983 liability.

The court then turned to Mr. Luellen's suspension. The court first rejected Mr. Luellen's claim that he was suspended as a result of his support for Stiglich. Applying the analysis of *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), the court found that the fact that Chief Dawson supported Stiglich's opponent, Mayor Pastrick, was not evidence that Mr. Luellen's support of Stiglich was a motivating factor in his suspension.

The court also rejected Mr. Luellen's claim that Chief Dawson had violated his due process rights when Chief Dawson suspended him with pay without a hearing. Although the court acknowledged a due process right to a hearing prior to termination of employment, the court held

that the same rule did not apply to suspensions with pay. Furthermore, the court noted, Indiana law does not specifically provide for a pre-suspension hearing before a fire department employee is suspended with pay. The court also determined that Chief Dawson had provided Mr. Luellen with notice and opportunity to be heard concerning the suspension. Finally, the court held that Mr. Luellen's interest in his on-call pay was not a property interest that triggered the protection of the Due Process Clause.

Mr. Luellen timely appealed the district court's adverse judgment.

## II

## DISCUSSION

### A.  Illegal Search

#### 1.  Issues of Fact

Mr. Luellen maintains that genuine issues of material fact precluded the district court from entering summary judgment on behalf of the defendants with respect to his Fourth Amendment/illegal search claim. Mr. Luellen points to alleged discrepancies between the testimony given by Chief Dawson and Lt. Chavarria to show that a factual dispute exists concerning whether a CI provided the information to Lt. Chavarria. Specifically, Mr. Luellen maintains that when Chief Dawson was deposed, he stated that Lt. Chavarria had mentioned a suspicion of wrongdoing concerning ballots, but Chief Dawson did not testify that Lt. Chavarria mentioned a CI. According to Mr. Luellen, Chief Dawson's testimony undermines Lt. Chavarria's assertion that he received the phone call and information from a CI "because one could reasonably assume Chavarria would have mentioned the information he received from a confidential

source to Chief Dawson, if in fact there was such a source." Appellant's Br. at 14. We disagree.

Even a cursory examination of Chief Dawson's and Lt. Chavarria's testimony reveals that the statements of the two men are not in conflict. Chief Dawson testified that the police had a suspicion of wrongdoing and that he "mentioned something about some ballots" in Mr. Luellen's vehicle. Dawson Dep. at 58. This statement is completely consistent with Lt. Chavarria's testimony regarding the information that he received from the CI—specifically, that Mr. Luellen was at a house party collecting absentee ballots, that he placed the ballots in a grey bag and that he placed the bag in the trunk of his city vehicle. Mr. Luellen's belief that Lt. Chavarria would have mentioned the CI to Chief Dawson, and his further belief that Chief Dawson would have recalled this specific detail "is pure speculation and therefore raises no genuine issues of material fact that would preclude summary judgment." *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1145 (7th Cir. 1983).

## 2. Alleged Fourth Amendment Violation

Mr. Luellen also maintains that, even accepting the defendants' version of the events of April 18, 1999, Lt. Chavarria did not have probable cause to believe that he (Mr. Luellen) had violated any election law.

We note at the outset that Lt. Chavarria was not named as a defendant in this action and is not a party to this appeal. Mr. Luellen seeks to hold only Chief Dawson, Chief Alcala and the City of East Chicago liable for the actions of the officers on April 18, 1999. Thus, in order for Mr. Luellen to prevail, he not only must establish that his constitutional rights were violated, he also must show that each individual

defendant "caused the deprivation of a federal right." *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999) (internal quotation marks and citations omitted). Therefore, we look first to whether a constitutional violation took place. We then turn to the question whether the named defendants are legally responsible for the alleged violation.

" 'Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law.' " *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). The parties agree that the operative statute is Ind. Code § 3-14-2-16(4). That statute makes it a felony to knowingly receive "from a voter a ballot prepared by the voter for voting, except: . . . (D) a member of the voter's household or an individual designated as attorney-in-fact for the voter, when delivering an envelope containing an absentee ballot under [Ind. Code] § 3-11-10-1." Mr. Luellen posits that Lt. Chavarria did not have probable cause to believe that he had violated Ind. Code § 3-11-10-1 because the CI was not sure whether Mr. Luellen had been collecting absentee ballots or applications for absentee ballots. Because collecting applications for absentee ballots is not illegal, continues Mr. Luellen, Lt. Chavarria did not have probable cause to believe that a crime had been committed or that his vehicle contained evidence of a crime. We cannot accept this argument.

It is well settled that probable cause to search a vehicle exists if there is a "fair probability" that contraband or evidence of a crime will be found in that particular place. *See United States v. Ledford*, 218 F.3d 684, 688 (7th Cir. 2000). "While probable cause requires more than the mere suspicion, we do not require it to reach the level of virtual certainty." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th

Cir. 1994). We believe that, based on the information provided by the CI, Lt. Chavarria could conclude that there was a "fair probability" that the car contained evidence of a crime. The CI told Lt. Chavarria that Mr. Luellen was "[c]ollecting absentee ballots from the people who were at the party." Chavarria Dep. (8/14/01) at 29. However, Mr. Luellen suggests that the CI exhibited doubt about what was actually collected at the party and points to the following colloquy at Lt. Chavarria's deposition to bolster his argument:

Q:  What was Luellen supposedly doing?

A:  Collecting absentee ballots from the people who were at the party.

Q:  Anything else stated to you by this source.

A:  No, sir.

Q:  Did the person indicate whether it was ballots or applications for ballots?

A:  They really weren't sure, they just said he was collecting some absentee ballots. That's what I was told.

Q:  Well, did the person say he was collecting ballot applications or did he say the person was collecting ballots?

. . .

A:  Said he was collecting absentee ballots.

Chavarria Dep. (8/14/01) at 29. Reading the passage in context, Lt. Chavarria states three times during the course of this page of his deposition that the CI told him that Mr. Luellen was collecting absentee ballots. Any confusion on the issue was resolved by the final question set forth above

in which Lt. Chavarria testifies as to exactly what he was told by the CI. Consequently, we believe it is clear that the information conveyed to Lt. Chavarria from the CI was that Mr. Luellen had been collecting absentee ballots.

Mr. Luellen continues that, even if the CI identified the documents collected as absentee ballots as opposed to applications for absentee ballots, the CI did not provide Lt. Chavarria with sufficient information to discern whether one of the exceptions to the statute applied, namely that a person may collect absentee ballots, without running afoul of the above statute, if the person is "a member of the voter's household or an individual designated as attorney-in-fact for the voter." However, it strains credulity to conclude that Mr. Luellen went to the home of a third party to collect ballots only from members of his own household. A reasonable officer would only be exercising common sense in reaching the opposite conclusion. Consequently, we believe that the "household" exception set forth in Ind. Code § 3-14-2-16 does not negate probable cause under the circumstances.[4]

Because we conclude that Lt. Chavarria had probable cause to search Mr. Luellen's vehicle, there is no Fourth Amendment violation to impute to defendants Chief Dawson and Chief Alcala. *See Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989). Consequently, we affirm the district court's grant of summary judgment to Chief Dawson

---

[4]  In his reply brief, Mr. Luellen argues that information from a CI, standing alone, is insufficient to support probable cause to search the vehicle. However, Mr. Luellen failed to raise this argument in his opening brief; it is therefore waived. *See Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 n.5 (7th Cir. 1994) ("Arguments raised for the first time in the reply brief are waived.").

and Chief Alcala with respect to Mr. Luellen's Fourth Amendment claims.[5]

---

[5] However, even if we had concluded that probable cause was lacking, Mr. Luellen would face substantial hurdles in attributing the constitutional violation to Chiefs Dawson and Alcala. With respect to Chief Dawson, Mr. Luellen argues that the combination of Chief Dawson's permission and Lt. Chavarria's belief that he did not need a warrant to open the trunk (based on the fact that fire department officials had the right to inspect ECFD vehicles), is sufficient for a jury to conclude that, but for Chief Dawson's permission, Lt. Chavarria would not have opened the trunk.

If, indeed, Lt. Chavarria relied on Chief Dawson's permission, the question then would become whether Chief Dawson's permission is sufficient to permit inspection of the ECFD vehicle without probable cause, that is whether Mr. Luellen had a reasonable expectation of privacy in the ECFD-issued vehicle. It is true, as noted by Mr. Luellen, that the defendants did not argue this issue with any vigor before the district court; however, Chief Dawson ultimately could not be held liable for an illegal search based on a lack of probable cause if he had the authority to permit the search in the absence of probable cause.

The Supreme Court has stated that "[g]iven the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987) (plurality). In the present case, the vehicle belonged to the ECFD, was maintained by the ECFD and was insured by the ECFD. It was assigned by the ECFD not to Mr. Luellen personally, but to the position which he held. As well, the ECFD possessed a key to the vehicle assigned to Mr. Luellen. Finally, Chief Dawson testified that, with his permission, an ECFD vehicle could be inspected, *see* Dawson Dep. at 55, and he had authorized such an inspection in the past, *see id.* Conse-
(continued...)

## B. Denial of Due Process

Mr. Luellen next argues that his suspension with pay violated due process because it occurred without a hearing and resulted in the loss of his on-call pay.[6] We consider this claim below.

"Procedural due process claims require a two-step analysis. The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the sec-

---

[5] (...continued)

quently, given these facts, we believe that Mr. Luellen could not have established a reasonable expectation of privacy with respect to the ECFD vehicle assigned to him.

Furthermore, with respect to Chief Alcala, although Mr. Luellen includes him in the heading of his brief concerning personal liability, his brief contains no argument as to why Chief Alcala's minimal involvement in these events renders him personally liable for any Fourth Amendment violation. Any argument with respect to Chief Alcala is, therefore, waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

Finally, because we hold that there was no Fourth Amendment violation, and because we further believe that, in any event, Chiefs Dawson and Alcala could not be held liable for any violation, there is no action by a policymaker that could impute liability to the City of East Chicago pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).

[6] Mr. Luellen also apparently lost overtime pay, *see* Luellen Dep. at 53-54; however, he does not argue that his overtime pay constitutes a property interest for purposes of the Due Process Clause.

ond requires a determination of what process is due." *Strasburger v. Bd. of Educ., Harden County Comm. Unit Sch. Dist. No. 1*, 143 F.3d 351, 358 (7th Cir. 1998) (internal quotation marks and citations omitted). In the employment context, the Supreme Court has made clear that "[t]he protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected 'property' interest." *Gilbert v. Homar*, 520 U.S. 924, 928 (1997). Consequently, the first issue we must address is whether Mr. Luellen's on-call pay constitutes a property interest deserving of protection under the Due Process Clause.

## 1. Property Interest

To determine whether a property interest exists in a particular aspect of employment, a court must look to state law. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). However, Mr. Luellen has not come forward with any evidence that on-call pay constitutes a property interest under Indiana law. Indeed, the only statutory indications are that the opposite is true. *See, e.g.*, Ind. Code § 36-8-1-11 (defining, for purposes of all of Article 8 (including discipline of public safety officers), salary as excluding overtime pay and comp time).

Even in the absence of explicit statutory protection, however, this court has acknowledged that removal or suspension—even a suspension with pay—from a statutorily protected employment position "might produce indirect economic effects that trigger the protection of the Due Process Clause." *Townsend v. Vallas*, 256 F.3d 661, 676 (7th Cir. 2001). We do not believe that Mr. Luellen's loss of on-call pay falls within this exception; indeed, we believe it closely akin to the claim that we rejected in *Townsend*.

In *Townsend*, a teacher was suspended and temporarily reassigned to an administrative position, with pay, pending an investigation into a death of a student. The teacher argued that, although he received his teaching salary, he had lost the opportunity to earn additional income from coaching positions, and this constituted a deprivation of property under the Due Process Clause. We rejected this argument:

> In our view, the temporary loss of this possibility for additional income does not warrant the characterization [of a property interest] given by the district court. We have recognized that removal or suspension from a tenured position might produce indirect economic effects that trigger the protection of the Due Process Clause. Nevertheless, we do not believe that the temporary loss of this possibility for additional income is the sort of deprivation that triggers the protection of federal due process.

*Id.*

Like the coaching position in *Townsend*, Mr. Luellen's on-call pay was not protected by statute. Furthermore, it does not appear to be so integral to his position with the ECFD such that the loss of this aspect of his pay could be deemed to be a loss of his position. We therefore conclude that Mr. Luellen's loss of on-call pay was not a cognizable property right for purposes of the Due Process Clause.

## 2. Procedural Safeguards

Even if Mr. Luellen had a property interest in his on-call pay, we believe the requirements of due process were met under the circumstances. The Supreme Court has explained that due process " 'unlike some legal rules, is not a technical

conception with a fixed content unrelated to time, place and circumstances.' " *Gilbert*, 520 U.S. at 930 (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Instead, it " 'is flexible and calls for such procedural protections as the particular situation demands.' " *Id.* (quoting *Morissey v. Brewer*, 408 U.S. 471, 481 (1972)). Traditionally, the Court has looked to three factors to determine what process is "due" under the circumstances: " 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the proce-dures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Govern-ment's interest.' " *Id.* at 931-32 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

In *Loudermill*, the Court applied these factors to determine whether due process required a governmental body to provide a pre-termination hearing to a public employee who could be terminated only for cause. The Court concluded that, weighing these factors, due process requires " 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Loudermill*, 470 U.S. at 542 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972)). It specifically noted that "[t]he governmental interest in immediate termination does not outweigh" the individual's interest in continued employment and the risk of an erroneous deci-sion. *Id.* at 544. The Court explained that "affording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. . . . [I]n those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspend-ing with pay." *Id.* at 544-45 (footnote omitted).

The Court's balancing in *Gilbert* also is instructive. In *Gilbert*, the Court considered whether a state university violated the due process rights of a member of its police force when it suspended the officer without pay—and without a hearing—when it learned that he had been arrested and charged with a drug felony. Considering the first of the *Mathews* factors—the private interest that will be affected by the governmental deprivation—the Court observed:

> [W]hile our opinions have recognized the severity of depriving someone of the means of his livelihood, they have also emphasized that in determining what process is due, account must be taken of "the *length*" and "*finality* of the deprivation." Unlike the employee in *Loudermill*, who faced *termination*, respondent faced only a *temporary suspension* without pay. So long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all . . . .

*Gilbert*, 520 U.S. at 931 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982); additional citations omitted). Balancing the remaining factors, the Court determined that the State's failure to provide a pre-suspension hearing, under the circumstances, was not a due process violation. However, it remanded for further proceedings to determine whether the officer "was provided an adequately prompt *post*-suspension hearing." *Id.* at 935.

Using *Loudermill* and *Gilbert* as our guides, we cannot conclude that the lack of pre-suspension hearing in this case violated due process. With the exception of the use of the ECFD vehicle, Mr. Luellen has not come forward with any

evidence that he lost any pay (regular or on-call) or benefits between the time that he was informed of his suspension, April 21, 1999, and the time that a hearing took place, April 22, 1999. This amounts at most to a minor and short-lived inconvenience.

As in *Gilbert*, the more pressing question is whether the post-suspension process satisfied the requirements of due process. In the present case, Chief Dawson informed Mr. Luellen of the basis for his suspension with pay (potential violation of the election laws) and the evidence against him (the "items confiscated from your fire department vehicle," R.84, Ex.4). Chief Dawson also informed Mr. Luellen of the time and place (April 22, 1999, in the Board of Public Safety's hearing room) that the information would be presented to the Board of Public Safety for confirmation of Chief Dawson's administrative action. Finally, Chief Dawson apprised Mr. Luellen that, if his suspension was confirmed, he would have ten days to file a written demand for an investigation with the East Chicago Fire Civil Service Commission.

Reviewing the *Mathews* factors, we believe that Chief Dawson's actions met the requirements of due process. First, the interest at issue—Mr. Luellen's on-call pay—was only a fraction of his salary; his regular salary and benefits stayed intact. Second, there was little chance of "an erroneous deprivation" taking place; Mr. Luellen was suspended for unbecoming conduct, and the evidence—the completed absentee ballots found in Mr. Luellen's trunk—was indisputable. Additionally, although additional or substitute process was unlikely to shed more light on the matter, Mr. Luellen was informed that he could demand an investigation by the East Chicago Fire Civil Service Commission. Finally, the City of East Chicago had a strong interest in

ensuring that its ranks of employees did not include those strongly suspected of engaging in election-law violations. Consequently, because Mr. Luellen's deprivation was relatively small and the City's interest relatively strong, and because Mr. Luellen was provided with the opportunity for additional procedures to vindicate his rights but did not avail himself of those opportunities, we believe that the requirements of due process were satisfied.[7]

## C.  First Amendment Violation

Finally, Mr. Luellen contends that the search of the car and his suspension with pay were motivated by his political support of Stiglich. Because we have concluded that probable cause existed to search Mr. Luellen's vehicle, we need not consider any of the parties' motivations in conducting, authorizing or approving that search. *See Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989).

Turning to the alleged First Amendment violations involved in his suspension, Mr. Luellen points to several

---

[7] Mr. Luellen maintains that he was confused regarding how to vindicate his rights because he received two memoranda from Chief Dawson referencing his alleged wrongdoing and mentioning an investigation. We find this argument unpersuasive. The longer of the two documents, delivered to Mr. Luellen on April 21, 1999, clearly states that the East Chicago Fire Civil Service Commission would conduct an investigation only if the Board confirmed Mr. Luellen's suspension on April 22, 1999, and then only upon his demand. The second memorandum, also delivered on April 21, 1999, informs Mr. Luellen of an internal ECFD investigation that already had commenced. Consequently, a reasonable person reading both memoranda could not have concluded that the investigations were one and the same.

pieces of evidence that, he argues, suggest that Chief Dawson had an illicit motivation in suspending him. For instance, Mr. Luellen states that "Dawson relied on the allegations of Sheriff Buncich, a Pastrick supporter, rather than conducting an investigation and giving Luellen an opportunity to be heard." Appellant's Br. at 23. However, the principle evidence presented by Sheriff Buncich to the Board of Public Safety was the evidence that completed absentee ballots were found in Mr. Luellen's vehicle—a fact that is undisputed. Mr. Luellen also points to the fact that Chief Dawson supported Mayor Pastrick's campaign. However, this court has made clear that an individual cannot prove that an action was politically motivated "merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981). Consequently, the fact that Chief Dawson—or any of the other individuals involved in Mr. Luellen's suspension—supported Mayor Pastrick, is not sufficient to establish a prima facie case that Mr. Luellen's support of Stiglich was a motivating factor in his suspension. Because the burden was on Mr. Luellen to come forward with evidence to show that Chief Dawson's action in suspending Mr. Luellen was politically motivated, and because Mr. Luellen has failed to meet this burden, we affirm the judgment in favor of the defendants.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court granting summary judgment to the defendants on all of Mr. Luellen's claims.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*